IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 17-00112-01-CR-W-BP |
| | ) | |
| MATIAS ISAAC RODRIGUEZ, | ) | |
| | ) | |
| Defendant. | ) | |

REPORT AND RECOMMENDATION

This matter is currently before the Court on Defendant's Motion to Suppress Evidence (Doc. #32). For the reasons set forth below, it is recommended that the portion of the motion seeking the suppression of a statement defendant made at the scene, which statement was made in response to questioning initiated by a law enforcement officer, be granted. The remainder of the motion should be denied.

I. INTRODUCTION

On March 10, 2017, a Criminal Complaint was filed against defendant Matias Isaac Rodriguez. On March 29, 2017, the Grand Jury returned a one-count Indictment against defendant Rodriguez. The Indictment charges that on March 9, 2017, defendant knowingly possessed with intent to distribute 500 grams or more of methamphetamine.

A two-day evidentiary hearing on the motion to suppress was begun on December 20, 2018, and completed on March 1, 2019. Defendant Rodriguez was represented by appointed counsel Gerald Gray II. The Government was represented by Assistant United States Attorney Bradley K. Kavanaugh. The Government called Detective John Pickens of the Kansas City,

Missouri Police Department as a witness. Defendant Rodriguez called Detectives Arthur Willingham, Yale Acton, Brian Ruch, and Aaron Hendershot, Forensic Specialists Michelle Nordyke and Melissa Steinke, Officer Molly Mast, and Task Force Officer Errol Riggins of the Kansas City, Missouri Police Department, and Greyhound Bus Station Manager Steven Dunn to testify.

## II. FACTS

On the basis of the evidence adduced at the evidentiary hearing, the undersigned submits the following proposed findings of fact:

1. On March 9, 2017, Detective John Pickens of the Kansas City, Missouri Police Department, who was assigned to the Metro Meth Unit and the Missouri Western Interdiction and Narcotics ("MoWIN") Task Force, was on duty at the Greyhound Bus Station at 1101 Troost in Kansas City, Missouri. (Tr. I[1] at 5-7.) Detective Pickens's duties include going to mass transit locations such as the Greyhound Bus Station and the Amtrak Train Station to look for criminal activity. (Tr. I at 6.) Other members of the MoWIN Task Force who were working interdiction with Detective Pickens at the Greyhound Bus Station included Detectives Aaron Hendershot, Yale Acton, Brian Ruch, and Molly Mast.[2] (Tr. I at 7.)

2. On March 9, 2017, Detective Pickens observed a bus, which route Pickens believed[3] originated in El Paso, Texas,[4] arrive at the Greyhound Bus Station. (Tr.

---

[1]Tr. I refers to the transcript of the hearing held on December 20, 2018. Tr. II refers to the transcript of the hearing held on March 1, 2019.

[2]On March 9, 2017, Molly Mast, now a police officer, was a detective with the Kansas City, Missouri Police Department. (Tr. II at 169.)

[3]Defendant's Exhibit 13, a document that shows routes in regard to arrivals and departures for the Greyhound Station in Kansas City, does not show a bus coming out of El Paso, Texas. (Tr. II at 130-33.) Steven Dunn, the manager of the Greyhound Bus Station testified that the document shows connection cities. (Tr. II at 133.) A bus coming from El Paso would either come through Denver or Oklahoma City. (Tr. II at 133.) Detective Pickens testified that his understanding that the bus route originated in El Paso came from talking to bus drivers over the years who drove the route. (Tr. II at 64.)

[4]Detective Pickens testified that Texas is a known source state for narcotics. (Tr. II at 80.) The MoWIN Task Force has made numerous narcotics arrests and seizures from the El Paso bus route.

2

I at 7, 41; Tr. II at 79-80.)   Detective Pickens observed a passenger (later identified as Matias Rodriguez) exiting the bus who appeared to be observing the police K-9[5] conducting sniffs of the luggage in the lower luggage unit of the bus.   (Tr. I at 7.) Detective Pickens testified that from his position in the terminal, he could see Rodriguez inside the bus.   (Tr. I at 24.)   As Rodriguez was walking through the bus, Detective Pickens saw Rodriguez looking back toward where the dog was working on the side of the bus.   (Tr. I at 24.)   Detective Hendershot testified that it looked like Rodriguez observed the dog working so he quickly exited the bus.   (Tr. II at 201.)   The time stamp on the bus terminal's surveillance video shows Rodriguez stepping off the bus at 6:58:18 a.m.   (Tr. I at 23; Gov. Exh. 1.) Detectives Pickens and Hendershot each testified that Rodriguez exited the bus carrying a backpack and a suitcase and beelined straight away from the bus, walking directly into the bus terminal.   (Tr. I at 7-8, 24; Tr. II at 199.)   Detective Pickens testified that Rodriguez's actions appeared abnormal.   (Tr. I at 24.) Detective Hendershot testified that Rodriguez's actions separated his behavior from the others who were exiting the bus.   (Tr. II at 199.)   Detective Pickens testified that most of the time, passengers will carry a backpack or a small personal item onto the bus and their luggage will go in the compartment under the bus.   (Tr. I at 24-25.)   In Detective Pickens's experience as a detective in the Interdiction Unit, carriers of narcotics or weapons keep their product with them, rather than putting it under the bus.   (Tr. I at 25.)   Detective Pickens also noted that as other passengers exited the bus, they stretched their legs and lingered about for a moment.   (Tr. I at 24.)   Detective Pickens testified that his attention was drawn to Rodriguez because it appeared that Rodriguez was trying to create distance between himself and the K-9.   (Tr. I at 9.)   Both Detective Pickens and Detective Hendershot testified that the fact that Rodriguez was Hispanic did not make them suspicious of him.   (Tr. II at 89, 201.)   Detective Hendershot testified that several Hispanics exited the bus prior to Rodriguez exiting the bus.   (Tr. II at 201.)

3.   Detective Pickens testified that as Rodriguez walked into the terminal, Rodriguez appeared to observe Pickens and his partner.   (Tr. I at 8.)   Detective Pickens testified that Rodriguez had an "oh, my goodness" look on his face and appeared nervous.   (Tr. I at 8, 26.)   Rodriguez set his bags down, walked to the far back corner of the terminal toward the restrooms, looked around as he walked as if to see over his shoulder, and then immediately turned around, retrieved his backpack and

---

(Tr. II at 80.)

[5]Detective Acton was the officer handling the narcotics detecting K-9.   (Tr. I at 8.)   Detective Acton testified that K-9 Bennett had been certified in 2012, 2013, 2014, 2015, and 2016 by the National Police K-9 Association to alert to the scents of cocaine, marijuana, methamphetamine, and heroin.   (Tr. II at 163-64.)   As of March 9, 2017, K-9 Bennett had assisted in the seizure of 705.64 pounds of marijuana, 46.03 pounds of methamphetamine, 24.79 pounds of cocaine, 1.3 pounds of heroin, 2,633 units of Ecstasy, $275,260.00 in U.S. currency, and 1.1 gallons of PCP. (Tr. II at 164.)

suitcase, and headed toward the exit doors. (Tr. I at 8-9, 26.) Detective Pickens testified that it appeared to him that Rodriguez was shifting his eyes and looking around the terminal as if to see if he was being watched or followed. (Tr. I at 9.) Detective Pickens provided the following testimony regarding Rodriguez's behavior:

> [T]hat's nervous behavior that I've recognized through my experience. When he first saw us, I think he recognized that I was a police officer, and he wanted to separate himself from his bags. Then he, what I observed was he walked away from them, like oh, my gosh, what am I going to do, and then he got to a point, he's like, okay, I'm just going to grab them and go. And he came right back to his bag.

(Tr. I at 27.) Detective Hendershot testified that Rodriguez exhibited nervous behavior inside the terminal when he set his bags down, went up to a vending machine for approximately a second or two, continued to look around, returned to those bags, picked up the bags, and attempted to exit. (Tr. II at 202.) This nervous behavior caused Detective Hendershot to suspect criminal activity. (Tr. II at 217-18.)

4.      Detective Pickens was standing by the exit doors. (Tr. I at 9.) These doors exit the terminal out to the city. (Tr. I at 13; Tr. II at 235.) There are no buses outside these doors. (Tr. I at 13; Tr. II at 235.) As defendant Rodriguez approached the exit doors, Detective Pickens made contact with him. (Tr. I at 8-9.) The time stamp on the bus terminal's surveillance video shows this contact occurred at 6:59:53 a.m. (Tr. I at 28; Gov. Exh. 1.) Detective Pickens testified that he approached Rodriguez because Pickens found the combination of Rodriguez's behavior, his demeanor, and his actions to be suspicious. (Tr. II at 80-81.) Detective Pickens testified that it is common for members of the MoWIN Task Force to approach individuals displaying suspicious behavior and ask to engage in a consensual conversation. (Tr. II at 81-82.) Detective Pickens identified himself as a police officer and showed Rodriguez his badge and identification. (Tr. I at 9.) Detective Pickens asked if he could talk to Rodriguez and Rodriguez said yes. (Tr. I at 9-10.) Detective Pickens asked Rodriguez where he was traveling from and Rodriguez said he was coming from Denver, Colorado. (Tr. I at 10.) Detective Pickens testified that he found this odd knowing that the bus that Rodriguez had just exited did not travel through Denver,[6] it came out of Texas.

---

[6]Detective Pickens misspoke at one point in the hearing stating that the bus "[o]riginates down in El Paso, travels through Denver and comes all the way up to Kansas City." (Tr. I at 43.) However, both before and after this statement, Detective Pickens stated that the bus traveled from El Paso to Dallas to Oklahoma City and then to Kansas City. (Tr. I at 41-43.) Further, Detective Pickens testified, "at no time did that bus go through Denver." (Tr. I at 43.)

(Tr. I at 10.)   Detective Pickens asked Rodriguez how long he had been in Denver and Rodriguez said that he had been living there for approximately three months. (Tr. I at 10.)   Detective Pickens asked to see Rodriguez's bus ticket.   (Tr. I at 11.) Rodriguez handed Detective Pickens his bus ticket and Pickens observed it to originate out of Indio, California.[7]   (Tr. I at 11; Gov. Exh. 2.)   The ticket did not show that the bus had passed through Colorado before reaching Kansas City.   (Tr. I at 12; Tr. II at 88.)   Detective Pickens testified that at this point in the conversation, Rodriguez appeared nervous and his voice was cracking.   (Tr. I at 10.)   When Rodriguez handed Detective Pickens his bus ticket, Rodriguez's fingers were shaking uncontrollably.   (Tr. I at 11-12.)   At one point, Rodriguez looked down and took a deep breath before responding to Detective Pickens.   (Tr. I at 11.)   Detective Pickens asked Rodriguez where he was heading and Rodriguez said he was going to Iowa to see family.   (Tr. I at 10.)   The itinerary for the ticket showed a final destination of Osceola, Iowa.   (Gov. Exh. 2.)   The exit doors to which Rodriguez was headed would not have gotten him to a bus to continue his travel to Iowa.   (Tr. I at 13.)

5.    Detective Pickens testified that he knew from defendant Rodriguez's answers to his questions and body language that Rodriguez was lying and trying to hide something.   (Tr. I at 12.)   Detective Pickens testified that he felt that criminal activity was afoot, but he was not sure if Rodriguez was a fleeing fugitive or if he was carrying narcotics or a gun.   (Tr. I at 12.)

6.    As Detective Pickens was looking at defendant Rodriguez's bus ticket, Pickens dropped a piece of paper (a reboarding pass) that Rodriguez had handed him.   (Tr. I at 12, 28.)   The time stamp on the bus terminal's surveillance video shows Detective Pickens dropping the piece of paper at 7:00:22 a.m.   (Tr. I at 28; Gov. Exh. 1.)   At 7:00:25 a.m., when Detective Pickens bent down to pick up the piece of paper, Rodriguez dropped his suitcase and attempted to flee out the front doors of the terminal.   (Tr. I at 12, 29; Gov. Exh. 1.)   Detective Pickens ordered Rodriguez to stop, but Rodriguez did not comply.   (Tr. I at 14; Tr. II at 179.) Rodriguez knocked Detective Ruch into a doorframe, injuring Ruch's neck.   (Tr. I at 13; Tr. II at 179-80.)   Detective Pickens then grabbed hold of Rodriguez and they struggled and went to the ground.   (Tr. I at 13.)   Detective Hendershot came to Detective Pickens's aid and they struggled with Rodriguez on the ground for several moments.   (Tr. I at 13.)   The officers were commanding Rodriguez to stop resisting, to stop fighting, and to put his hands behind his back.   (Tr. I at 13-14; Tr. II at 218-19.)   Rodriguez continued to struggle, reaching toward his waistband. (Tr. I at 13.)   Detective Pickens believed that Rodriguez was attempting to retrieve a weapon.   (Tr. I at 15.)   The officers were able to gain control of Rodriguez on the ground and place him in handcuffs.   (Tr. I at 13, 15.)   Detective Pickens testified that Rodriguez was placed in handcuffs for the safety of the officers and others and to maintain the status quo while Pickens investigated further

---

[7]Detective Pickens testified that California is a known source state for narcotics.   (Tr. II at 88.)

Rodriguez's suspicious activity. (Tr. II at 83-84.) Detective Hendershot used a knife to cut off Rodriguez's backpack. (Tr. II at 219.) Detective Pickens conducted a brief frisk of Rodriguez to make sure he had no weapons. (Tr. I at 15.)

7.     Detective Pickens testified that when defendant Rodriguez dropped his suitcase and ran, Pickens did not know what was in Rodriguez's bag, he did not know why Rodriguez was trying to run, and he did not know why Rodriguez had lied to him. (Tr. I at 14-15.) However, Detective Pickens believed that Rodriguez was involved in some sort of criminal activity. (Tr. I at 14.) Detective Pickens testified that he needed to investigate further to determine why Rodriguez was fleeing and throwing his bag away from him. (Tr. I at 14.) Detectives Pickens and Hendershot each testified that Rodriguez was at this point detained for further investigation. (Tr. I at 80; Tr. II at 231.)

8.     After defendant Rodriguez was handcuffed, Detective Pickens stood Rodriguez up and asked him why he was trying to run. (Tr. I at 15.) Detective Pickens testified that he asked the question because he was continuing his *Terry* stop investigation. (Tr. I at 15.) Rodriguez responded, "Because I have meth in my bag."[8] (Tr. I at 15, 89.) Detective Pickens testified that Rodriguez made this statement prior to being placed under arrest. (Tr. I at 31.) Rodriguez was then escorted to an office in the rear of the Greyhound Bus Station. (Tr. I at 16.) Detective Pickens asked Rodriguez if he could search his bags and Rodriguez said, "No, I want a lawyer." (Tr. I at 16, 89.)

9.     Detective Pickens asked Detective Acton, who was still on site with his K-9, to respond and conduct a sniff check of defendant Rodriguez's bags. (Tr. I at 16.) Rodriguez's bags were placed near similar luggage in the storage area of the Greyhound Bus Station. (Tr. I at 18.) Detective Pickens did not advise Detective Acton which of the bags in the storage area belonged to Rodriguez. (Tr. II at 166.) The K-9 was brought into the storage area to conduct an open air sniff check. (Tr. I at 18; Tr. II at 152-54.) The K-9 alerted to the odor of narcotics on both of Rodriguez's bags. (Tr. I at 16, 18; Tr. II at 152-53.) At that point, Detective Pickens told Rodriguez that he was under arrest for investigation of possession of a controlled substance and advised him of his *Miranda* rights. (Tr. I at 16; Tr. II at 231.) Detective Pickens signed the *Miranda* waiver form at 7:16 a.m. (Tr. I at 16-17.) Rodriguez refused to sign the form. (Tr. I at 17.) Detective Hendershot testified that Rodriguez asked for a lawyer. (Tr. II at 233.) Detective Hendershot further testified that once Rodriguez asked for an attorney, there was no

---

[8]Detectives Ruch and Hendershot did not recall hearing Detective Pickens's question or defendant Rodriguez's response. (Tr. II at 180, 225.) The bus terminal's surveillance video shows that Detectives Ruch and Hendershot were separated from Detective Pickens and Rodriguez as Pickens stood Rodriguez up. Detective Hendershot appears to be checking on Detective Ruch and then Ruch and Hendershot can be seen gathering Rodriguez's property. (Gov. Exh. 1 at 7:01:28-7:01:44.)

conversation between the officers and Rodriguez. (Tr. II at 224-25.) Rodriguez was transported to the South Patrol Division pending the outcome of Detective Pickens's application for search warrants for Rodriguez's two bags. (Tr. I at 17.)

10. Detective Pickens testified that defendant Rodriguez sustained no injuries during the struggle after he attempted to flee. (Tr. I at 31.) Rodriguez never complained of any injuries to Detective Pickens. (Tr. I at 31, 89.) Detective Pickens testified that no one threatened defendant Rodriguez at any point that morning. (Tr. I at 31.) Detective Pickens testified that after Rodriguez requested an attorney, no one attempted to ask Rodriguez any questions. (Tr. I at 31.) Detective Pickens testified that no one told Rodriguez that he was going to jail for a long time. (Tr. I at 31-32.)

11. Detective Pickens applied to the Jackson County, Missouri Circuit Court for search warrants for the backpack and the suitcase. (Tr. I at 18.) Detective Pickens provided the following as factual support in the Application for Search Warrant:

> On 03/09/2017 at about 0700 hours, I along with detectives Mast, Ruch, Acton and Det. Hendershot were conducting drug interdiction activities at the Greyhound bus station located at 1101 Troost Ave, Kansas City, Jackson Count, Missouri.
>
> I observed a bus arrive, which originated out of El Paso, Texas with an ending destination in Kansas City, Missouri. Texas is a known source state for narcotic distribution. Members of the Drug Interdiction Squad have made numerous narcotic arrests and seizures from this bus route.
>
> I observed a Hispanic male later identified as Matias I Rodriguez H/M 05/27/1992 exit the bus carrying a black backpack, a small black with brown trim suitcase, green blanket and blue travel pillow. Rodriguez appeared to observe a police K-9 working the lower luggage area of the bus in plain view. Rodriguez was looking around the platform area and walked away from the bus and into the terminal. While walking through the terminal Rodriguez appeared to be looking around the waiting area as if to see if he was being watched or followed. Rodriguez set his luggage down on a bench and walked away toward the restrooms. Rodriguez quickly returned to his luggage, picked it up and began to walk toward the front exit doors.
>
> I contacted Rodriguez and identified myself to him as a police officer and showed him my identification card and badge. I asked Rodriguez if I could talk to him, to which he stated "yes." I asked Rodriguez where he was traveling from; Rodriguez stated he was

coming from Denver, Colorado. I asked Rodriguez how long he had been in Denver; Rodriguez stated had been there a few months working and was on his way to Iowa. I found this to be odd knowing the bus he exited did not travel through nor come from Denver. Rodriguez was very nervous, his voice cracked as he was talking, he looked down and took a deep breath. I asked Rodriguez where he was traveling to. Rodriguez stated he was traveling to Iowa to see family. I asked Rodriguez if I could see his bus tickets, which he handed to me. I observed Rodriguez's hand to be shaking when he handed me his bus ticket. I observed the bus ticket to originate from Indio, California with a a final destination of Osceola, Iowa issued to Matias Rodriguez. His bus ticket showed no travel through Denver, Colorado. This confirmed Rodriguez had been lying to me about his travels being he stated he was traveling from Denver, Colorado. While looking at the bus ticket Rodriguez attempted to run out the front doors. I ordered him to stop and attempted to detain him as he ran into Det. Ruch. We grabbed ahold of Rodriguez and he was taken to the ground and placed into handcuffs. While frisking Rodriguez, I asked him why he tried to run and fight with me. Rodriguez stated, "Because I have meth in my bag." I asked Rodriguez if he was willing to give me consent to open his bag. Rodriguez stated, he did not want me to search his bags and wanted a lawyer.

Detective Acton responded with K-9 Bennett and conducted a sniff check of both the back [sic] backpack and the black with brown trim suitcase Rodriguez was carrying. Det. Acton advised me K-9 Bennett alerted to both the black backpack and black with brown trim suitcase individually for the odor of narcotics.

Bennett is a six year old Labrador Retriever certified in 2012, 2013, 2014, 2015, and 2016, by the National Police Canine Association to alert to the scents of Cocaine, Marijuana, Methamphetamine, and Heroin. He was last certified in October, 2016. K-9 Bennett has assisted in the seizure of 705.64 pounds of Marijuana, 46.03 pounds of Methamphetamine, 24.79 pounds of Cocaine, 1.3 pounds of Heroin, 2633 units of Ecstasy, $275,260.00 in U.S. Currency, 1.1 gallons of PCP.

I advised Rodriguez he was under arrest for investigation of possession of a Controlled Substance. The black backpack and black with brown trim suitcase were transported to a KCPD facility in Jackson County, Missouri awaiting search warrant from Jackson County Circuit Court.

(Def. Exh. 14.)

12.     Detective Pickens obtained search warrants for the bags at approximately 1:00 p.m. on March 9, 2017.  (Tr. I at 18.)   After obtaining the search warrants, Detective Pickens opened the bags.  (Tr. I at 18, 95.)  In the backpack, Detective Pickens found two bundles (weighing 4.73 pounds) of a crystal-like substance which tested positive for the presence of methamphetamine.  (Tr. I at 18-19.)  The other bag did not have drugs in it.  (Tr. I at 95-96.)  Detective Pickens opined that the dog had hit on this bag because of residual odors or maybe the drugs were in that bag at one time.  (Tr. I at 96.)

13.     Forensic Specialist Steinke testified that she waited for a warrant to be obtained, recovered the items from Detective Pickens, and then tested the drugs.  (Tr. II at 108-09.)  Forensic Specialist Steinke testified that she did not test the drugs found in defendant Rodriguez's bag in the morning.  (Tr. II at 121.)  Task Force Officer Riggins testified that Detective Pickens alerted him to a potential[9] federal case prior to obtaining the search warrants because defendant Rodriguez had told Pickens that he had meth in his bag.  (Tr. II at 239-40.)

## III.  DISCUSSION

Defendant Rodriguez seeks to suppress all evidence seized as a result of an unlawful search and seizure and all statements obtained in violation of defendant's *Miranda* rights.  (Rodriguez Mot. to Suppress Evidence; Doc. #32.)  Defendant argues that his rights were violated in the following respects:

- Officers lacked reasonable suspicion and had no concrete reason to detain Mr. Rodriguez or believe that he was involved in criminal activity but targeted him solely because he fit their profile as a drug courier based on his ethnicity and travel;

- Officers continued to question Mr. Rodriguez after he requested an attorney despite no indication that he changed his mind and now wished to speak with officers; and

- Officers coerced Mr. Rodriguez to provide a verbal statement that there was methamphetamine in his bag by telling him that they were obtaining a warrant and were going to search his bags regardless.

---

[9]Task Force Officer Riggins testified that at the time he was contacted, "we didn't know what we had."  (Tr. II at 239.)

9

(Id. at 4.)   In a supplemental brief, defendant argued that his rights were violated in one additional respect:

- Officers searched Mr. Rodriguez's property without his consent and prior to obtaining a warrant to do so.

(Rodriguez Supplemental Brief at 7; Doc. #57.)   In his supplemental brief, defendant also makes a *Franks* challenge to the affidavit provided in support of the search warrant applications.   (*Id.* at 14-17.)

    A.    <u>The Initial Encounter with Defendant Rodriguez</u>

The Supreme Court has described three categories of police-citizen encounters.   *See Florida v. Royer*, 460 U.S. 491 (1983).   *See also United States v. Hernandez*, 854 F.2d 295, 297 (8th Cir. 1988).   "The first, and least intrusive, police contact occurs when law enforcement officers merely approach an individual on the street and ask if he is willing to answer some questions.   Because this encounter in a public place is consensual, it does not constitute a seizure within the meaning of the fourth amendment."   *Hernandez*, 854 F.2d at 297 (citing *Royer*, 460 U.S. at 497).   The second is a brief, minimally intrusive seizure or investigative stop which must be supported by a reasonable suspicion of criminal activity.   *See Royer*, 460 U.S. at 498-99; *Hernandez*, 854 F.2d at 297.   The third is a full-scale seizure arrest which must be supported by probable cause to arrest.   *See Royer*, 460 U.S. at 499; *Hernandez*, 854 F.2d at 297.

Law enforcement officers do not violate the Fourth Amendment by merely approaching an individual in a public place and asking him questions.   *See Florida v. Bostick*, 501 U.S. 429, 434 (1991); *United States v. Jones*, 990 F.2d 405, 408 (8th Cir.), *cert. denied*, 510 U.S. 934 (1993); *United States v. Campbell*, 843 F.2d 1089, 1092 (8th Cir. 1988).   No objective justification is required for such an encounter because no constitutional interest is implicated.   *See United States*

10

*v. Mendenhall*, 446 U.S. 544, 554-55 (1980); *United States v. Nunley*, 873 F.2d 182, 184 (8th Cir. 1989); *Campbell*, 843 F.2d at 1092.   As long as a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual.   Only when an officer, by means of physical force or show of authority, has in some way restrained the liberty of an individual should a court conclude that a seizure has occurred.   *See Bostick*, 501 U.S. at 434; *United States v. Robinson*, 984 F.2d 911, 913-14 (8th Cir. 1993).

In *United States v. Robinson*, 984 F.2d 911 (8th Cir. 1993), the Eighth Circuit affirmed the district court's ruling that the situation preceding Robinson's arrest was nothing more than a consensual encounter.   The pertinent facts of the *Robinson* case were set forth as follows:

On the morning of November 30, 1990, Robinson arrived at the Kansas City Amtrak station on the 7:15 a.m. train from Los Angeles. . . . [Detective] Sola approached Robinson and asked if he could talk to him.   Robinson agreed and Sola showed Robinson his badge and sat in the chair next to him.   Sola told Robinson that he regularly talked to Amtrak passengers and again asked if Robinson had the time to talk to him.   Robinson agreed.   Sola then asked to see Robinson's ticket, which was a one-way ticket from Los Angeles to St. Louis in the name of John Jones.   The connecting train was scheduled to depart at 9:15 a.m.

When Sola asked Robinson for identification, Sola noticed that Robinson appeared very nervous and seemed to have difficulty swallowing.   Robinson was unable to locate any identification and stated that his name was John Robinson and he lived in Lynwood, California. . . . At this point Sola asked if he could search Robinson's luggage for narcotics, to which Robinson answered "No."   Sola then told Robinson that he would order a narcotics-trained canine to sniff his luggage. Robinson said that he "did not want a dog" and told Sola to go ahead and look in the luggage.   Sola told Robinson that he did not have to give permission to search the bags but Robinson said that Sola could search the bags.

984 F.2d at 912.   Upon a search of Robinson's luggage, Sola discovered a box of cocaine and placed Robinson under arrest.   *Id.* at 913.   The Eighth Circuit concluded:

. . . During the questioning, the police detectives did not display their weapons or threaten to arrest Robinson.   The police detectives did not use physical force or show of authority to detain Robinson in the terminal.   Detective Sola began questioning Robinson around 7:30 a.m. and his train was not scheduled to depart

11

until 9:15 a.m.; by his own actions, Robinson was detained in the terminal for over an hour and a half. Under the facts of this case, the district court was not clearly erroneous in finding that the continued questioning was a consensual encounter that did not constitute a *Terry* stop.

*Id.* at 914.

In the present case, the initial contact between Detective Pickens and defendant Rodriguez was consensual. Detective Pickens approached Rodriguez in a public place, identified himself as a police officer and asked if he could speak with Rodriguez. (Fact No. 4.) Rodriguez said yes. (*Id.*) Detective Pickens asked Rodriguez where he was traveling from and Rodriguez said he was coming from Denver, where he had been living for three months. (*Id.*) Detective Pickens asked Rodriguez if he could see his bus ticket. (*Id.*) Rodriguez provided the ticket to the detective. (*Id.*) Detective Pickens asked Rodriguez where he was heading and Rodriguez said he was going to Iowa to see family. (*Id.*)

The Court finds that a reasonable person would have felt free to decline Detective Pickens's requests and terminate the encounter. Under *Robinson*, the facts of this case warrant a conclusion that the questioning of defendant constitutes a consensual encounter rather than a *Terry* stop. Prior to defendant Rodriguez's attempt to run, Detective Pickens neither detained nor interrogated Rodriguez.

B. The Seizure of Defendant Rodriguez

As set forth above, when an officer, by means of physical force or show of authority, has in some way restrained the liberty of an individual a seizure has occurred. The Court finds that defendant Rodriguez was seized at the point that he attempted to flee and Detective Pickens ordered him to stop. In determining whether an officer had reasonable suspicion to conduct an investigative stop, the court must look at the totality of the circumstances to see whether the

12

detaining officer had a particularized and objective basis for suspecting legal wrongdoing. *See*

*United States v. Montgomery*, 828 F.3d 741, 743-44 (8th Cir. 2016).

The record in this case establishes that Detective Pickens was observing passengers who

exited a bus that Detective Pickens believed had originated in El Paso, Texas. (Fact No. 2.)

Detective Pickens testified that Texas is a known source state for narcotics and that the MoWIN

Task Force has made numerous narcotics arrests and seizures from the El Paso bus route. (*Id.*)

Detectives Pickens and Hendershot each noticed a passenger (later identified as Matias Rodriguez)

exiting the bus who appeared to be observing the police K-9 conducting sniffs of the luggage in the

lower luggage unit of the bus. (*Id.*) Rodriguez exited the bus carrying a backpack and a suitcase

and beelined straight away from the bus, walking directly into the bus terminal. (*Id.*) The

detectives found that Rodriguez's actions separated his behavior from the others who were exiting

the bus. (*Id.*) Detective Pickens testified that most of the time, passengers will carry a backpack

or a small personal item onto the bus and their luggage will go in the compartment under the bus.

(*Id.*) In Detective Pickens's experience as a detective in the Interdiction Unit, carriers of

narcotics or weapons keep their product with them, rather than putting it under the bus. (*Id.*)

Detective Pickens also noted that as other passengers exited the bus, they stretched their legs and

lingered about for a moment. (*Id.*) Detective Pickens testified that his attention was drawn to

Rodriguez because it appeared that Rodriguez was trying to create distance between himself and

the K-9. (*Id.*) According to Detective Pickens, as Rodriguez walked into the terminal,

Rodriguez appeared to observe Pickens and his partner. (Fact No. 3.) Detective Pickens

testified that Rodriguez had an "oh, my goodness" look on his face and appeared nervous. (*Id.*)

Rodriguez set his bags down, walked to the far back corner of the terminal toward the restrooms,

looked around as he walked as if to see over his shoulder, and then immediately turned around,

retrieved his backpack and suitcase, and headed toward the exit doors. (*Id.*) Based on Rodriguez's behavior, his demeanor, and his actions, Detectives Pickens and Hendershot suspected criminal activity.[10] (Fact Nos. 3 and 4.)

As Rodriguez approached the exit doors, Detective Pickens made contact with him. (Fact No. 4.) Detective Pickens identified himself as a police officer and showed Rodriguez his badge and identification. (*Id.*) Detective Pickens asked if he could talk to Rodriguez and Rodriguez said yes. (*Id.*) Detective Pickens asked Rodriguez where he was traveling from and Rodriguez said he was coming from Denver, where he had been living for three months. (*Id.*) Detective Pickens found this odd knowing that the bus that Rodriguez had just exited did not travel through Denver. (*Id.*) Detective Pickens asked Rodriguez if he could see his bus ticket. (*Id.*) Rodriguez provided the ticket to the detective. (*Id.*) The itinerary for the ticket showed that Rodriguez began his trip in Indio, California, and that he did not pass through Denver on the way to Kansas City. (*Id.*) Detective Pickens testified that at this point in the conversation, Rodriguez appeared nervous and his voice was cracking. (*Id.*) When Rodriguez handed Detective Pickens his bus ticket, Rodriguez's fingers were shaking uncontrollably. (*Id.*) Detective Pickens asked Rodriguez where he was heading and Rodriguez said he was going to Iowa to see family. (*Id.*) The itinerary for the ticket showed a final destination of Osceola, Iowa. (*Id.*) The exit doors to which Rodriguez was headed would not have gotten him to a bus to continue his travel to Iowa. (*Id.*) Detective Pickens testified that he knew from defendant Rodriguez's answers to his

---

[10] Contrary to defendant's argument, no evidence was presented to suggest that defendant Rodriguez was targeted "solely because he fit their profile as a drug courier based on his ethnicity and travel" (Rodriguez Mot. to Suppress Evidence at 4; Doc. #32). Rather, Detectives Pickens and Hendershot each testified that the fact that Rodriguez was Hispanic did not make them suspicious of him. (Fact No. 2.) Further, several other Hispanic persons who exited the same bus as Rodriguez did not draw the officers' attention. (*Id.*)

14

questions and body language that Rodriguez was lying and trying to hide something. (Fact No. 5.) Detective Pickens felt that criminal activity was afoot, but he was not sure if Rodriguez was a fleeing fugitive or if he was carrying narcotics or a gun. (*Id.*)

As Detective Pickens was looking at Rodriguez's bus ticket, Pickens dropped a piece of paper that Rodriguez had handed him. (Fact No. 6.) When Detective Pickens bent down to pick up the piece of paper, Rodriguez dropped his suitcase and attempted to flee out the front doors of the terminal. (*Id.*) Detective Pickens ordered Rodriguez to stop, but Rodriguez did not comply. (*Id.*) The officers were able to grab Rodriguez and, after a struggle, place him in handcuffs. (*Id.*)

When defendant Rodriguez attempted to flee and Detective Pickens ordered him to stop and then seized him, Detective Pickens had a reasonable suspicion of criminal activity. Defendant Rodriguez had exhibited evasive and nervous behavior before Detective Pickens made contact with him which caused Detective Pickens and Hendershot to both suspect criminal activity. During Detective Pickens's conversation with Rodriguez, Pickens's suspicions escalated as Rodriguez's answers to Pickens's questions and body language suggested that Rodriguez was lying and trying to hide something. When Rodriguez attempted to flee, leaving his luggage behind, the presence of criminal activity seemed even more likely. The Court finds that Detective Pickens was justified in conducting an investigative stop. There was no constitutional violation.

C.    Defendant's Statement

Defendant Rodriguez argues that all statements should be suppressed for the following reasons:

> Officers continued to question Mr. Rodriguez after he requested an attorney despite no indication that he changed his mind and now wished to speak with officers; and

Officers coerced Mr. Rodriguez to provide a verbal statement that there was methamphetamine in his bag by telling him that they were obtaining a warrant and were going to search his bags regardless.

(Rodriguez Mot. to Suppress Evidence at 4; Doc. #32.)   The evidence presented at the hearing, however, does not support these arguments.   Based on the evidence presented at the hearing, defendant Rodriguez made one statement, "Because I have meth in my bag," which was made at the time that Detective Pickens stood Rodriguez up and was in response to Detective Pickens asking Rodriguez why he was trying to run.   (Fact No. 8.)   Once Rodriguez asked for an attorney, there was no conversation between the officers and Rodriguez.   (Fact No. 9.)

Even though defendant's stated reasons for suppression of statements must fail, the Court finds that the statement, "Because I have meth in my bag," should nevertheless be suppressed. *Miranda* warnings are required when there is a "custodial interrogation," which is defined by the Supreme Court as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."   *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).   In *United States v. Ray*, 690 Fed. Appx. 366, 368 (6th Cir. 2017), defendant Ray was handcuffed while officers executed a search warrant at his residence. Several firearms were discovered in the residence.   *Id.*   One of the officers asked Ray if he had been to jail before and Ray replied that he had been to federal prison.   *Id.*   The court found:

> . . . Even this brief and cursory exchange amounted to a custodial interrogation that required *Miranda* warnings.  *See Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980)("We conclude that the *Miranda* safeguards come into play whenever a person in custody is subject to either express questioning or its functional equivalent. . . . A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation.").

> For starters, there is no dispute that Ray was handcuffed at the time and, thus, "in custody" for *Miranda* purposes. . . . And asking a suspect whether he had a criminal record . . . certainly amounts to "express questioning" that "police should know is reasonably likely to evoke an incriminating response."  *See Innis*, 446 U.S. at

16

300-01 . . . .

690 Fed. Appx. at 372. *Accord United States v. Martinez*, 462 F.3d 903, 910 (8th Cir. 2006), *cert. denied*, 549 U.S. 1272 (2007); *United States v. Butler*, No. 4:16-00108-CR-RK, 2017 WL 6089072, at *6 (W.D. Mo. Dec. 7, 2017).

After defendant Rodriguez was handcuffed, Detective Pickens stood Rodriguez up and asked him why he was trying to run. (Fact No. 8.) Rodriguez responded, "Because I have meth in my bag." (*Id.*) The Court finds that defendant Rodriguez's statement came about as a result of a question posed by an officer after Rodriguez was taken into custody or otherwise deprived of his freedom of action. Detective Pickens should have known that his question was reasonably likely to evoke an incriminating response. The Court finds that defendant Rodriguez's statement, which was made in response to questioning initiated by a law enforcement officer, should be suppressed.

D.    Search of Property Without a Warrant

In Defendant's Supplemental Brief in Support of Motion to Suppress Evidence, defense counsel argued:

> Moreover, it is probable that Det. Pickens searched Mr. Rodriguez's property prior to obtaining the warrant. FS Steinke testified that she does not test drugs daily, however, she tested meth on the morning Mr. Rodriguez was arrested approximately 45-minutes after he was taken into custody. DX 17; *see also* Tr. 2 at 121-122. Further, FS Steinke testified that she mistakenly told Defense counsel that she had to go to the bus station to retrieve Mr. Rodriguez's other property but the drugs were in possession of officers because such testimony would've confirmed that a search of Mr. Rodriguez's property had taken place at the bus terminal prior to the warrant being issued. Tr. 2 at 110-112. However, FS Steinke couldn't account to what meth she was testing that morning and stated she needed to review notes. *Id.* at 121-122.
>
> Further, Det. Pickens contacted Det. Riggins shortly after taking Mr. Rodriguez into custody and placed him on standby that he might have a federal case for him. Tr. 2 at 238-240. Det. Riggins testified that he doesn't get called unless

17

the detectives know its [sic] going to be federal and the detectives have experience to know the difference. *Id.* Therefore, it is reasonable to infer that Det. Pickens called Det. Riggins that morning because he had already checked Mr. Rodriguez's property and determined that the quantity Mr. Rodriguez was in possession of was sufficient to satisfy the federal threshold. Det. Riggins testified that he can't recall if he went to the Greyhound station on the morning of March 9, 2017 but the video evidence shows what appears to be a police vehicle pull into the dock area around 8am, approximately an hour after Mr. Rodriguez is taken into custody and Det. Pickens appears to go a [sic] greet the driver who then appears to go and huddle with the other members of the task force prior to the video ending. See DX 1 (Ticketing) at 8:00:55-8:05:59.

This occurred approximately five hours before a search warrant is issued. Therefore, any search prior to the issuance of a search warrant is unreasonable per se and the evidence recovered should be suppressed.

(Doc. #57 at 9-10.)

While the Court appreciates defense counsel's efforts on behalf of his client, the conclusions drawn by defense counsel would require the Court to find that Detective Pickens and Forensic Specialist Steinke perjured themselves in the suppression hearing before this Court. Nothing in the record supports defense counsel's conclusions and suppositions. Detective Pickens clearly testified that he opened defendant Rodriguez's bags after obtaining the search warrants. (Fact No. 12.) Forensic Specialist Steinke testified that she waited for a warrant to be obtained, recovered the items from Detective Pickens, and then tested the drugs. (Fact No. 13.) Forensic Specialist Steinke testified that she did not test the drugs found in defendant Rodriguez's bag in the morning. (*Id.*) Task Force Officer Riggins testified that Detective Pickens alerted him to a potential[11] federal case prior to obtaining the search warrants because defendant Rodriguez had told Pickens that he had meth in his bag. (*Id.*) The Court finds the testimony of all the witnesses who testified at the suppression hearing to be credible. Defendant's argument that his

---

[11]Task Force Officer Riggins testified that at the time he was contacted, "we didn't know what we had." (Fact No. 13.)

bags were searched prior to the issuance of the search warrants is not supported by the evidence.

E.    The Search Warrant

The United States Supreme Court has set forth the following with respect to what is

required for a valid search warrant:

> The Fourth Amendment requires that search warrants be issued only "upon
> probable cause, supported by Oath or affirmation, and particularly describing
> the place to be searched, and the persons or things to be seized." . . .   [T]his Court
> has interpreted [these words] to require only three things.   First, warrants must
> be issued by neutral, disinterested magistrates.   Second, those seeking the
> warrant must demonstrate to the magistrate their probable cause to believe that
> "the evidence sought will aid in a particular apprehension or conviction" for a
> particular offense.   Finally, "warrants must particularly describe the 'things to be
> seized,'" as well as the place to be searched.

*Dalia v. United States*, 441 U.S. 238, 255 (1979)(citations omitted).

The Eighth Circuit Court of Appeals has set forth the following with respect to warrant

affidavits that are found to contain falsehoods or omissions:

> A facially valid warrant affidavit is constitutionally infirm if the defendant
> establishes that the affidavit includes deliberate or reckless falsehoods that, when
> redacted, render the affidavit's factual allegations insufficient to support a finding
> of probable cause.   *Franks v. Delaware*, 438 U.S. 154, 171 (1978). [12]
> Omissions likewise can vitiate a warrant if the defendant proves "first that facts
> were omitted with the intent to make, or in reckless disregard of whether they
> make, the affidavit misleading, and, second, that the affidavit, if supplemented by
> the omitted information, could not support a finding of probable cause."   *United
> States v. Allen*, 297 F.3d 790, 795 (8th Cir. 2002).

*United States v. Ketzeback*, 358 F.3d 987, 990 (8th Cir. 2004)(footnote supplied).   The

*Ketzeback* court set forth three steps to determine whether a warrant should be vitiated pursuant to

---

[12]In *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978), the Supreme Court held that if it is shown
by a preponderance of the evidence that a warrant affidavit includes a false statement made
knowingly and intentionally or with reckless disregard for the truth and if, with the affidavit's false
material excluded, the affidavit is insufficient to establish probable cause, "the search warrant
must be voided and the fruits of the search excluded to the same extent as if probable cause was
lacking on the face of the affidavit."

*Franks*:   (1) whether the officer intentionally omitted information from his affidavit; (2) whether the officer omitted the facts with the intent to mislead or in reckless disregard of the omissions' misleading effect; and (3) whether the officer's affidavit would not have been sufficient to support a finding of probable cause if the omitted facts had been included.   *Id.* at 990-91.

Defendant Rodriguez argues that he is entitled to suppression of the evidence seized during the execution of the search warrants because of the following false statements in the affidavit given in support of the search warrants:

- The bus Mr. Rodriguez was traveling on arrived in Kansas City originating out of El Paso, Texas;

- Mr. Rodriguez appeared to observe a police K-9 working the lower luggage area of the bus in plain view and was looking around the platform area;

- While walking through the terminal Mr. Rodriguez appeared to be looking around the waiting area as to see if he was being watched or followed;

- That Mr. Rodriguez told him he was coming from Denver, Colorado;

- That Det. Pickens spoke with Mr. Rodriguez regarding the nature of his travel or the duration;

- That Mr. Rodriguez told him while being frisked that he ran because he had meth in his bag.[13]

(Rodriguez Supplemental Brief at 15-16; Doc. #57.)

Contrary to defendant's argument that these statements are false, the Court finds each of

_____

[13]Given the Court's finding that defendant Rodriguez's statement, "Because I have meth in my bag," should be suppressed and the fact that defendant's statement was included as factual support in the application for search warrants, the Court feels compelled to note that the suppression of this statement does not require the suppression of evidence obtained pursuant to the warrants.   The Court finds that even without this statement, there were sufficient facts, i.e. defendant Rodriguez's actions along with the K-9 alert to the odor of narcotics on both of Rodriguez's bags, presented to the issuing judge to support a finding of probable cause that a controlled substance would be found within the bags.

these statements to be supported by the evidence presented at the hearing. Indeed, these statements can be found in the proposed findings of fact set out above. Thus, the Court finds that defendant is not entitled to the suppression of any evidence under *Franks*.

## IV.  CONCLUSION

Based on the foregoing, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order granting in part Defendant's Motion to Suppress Evidence (Doc. #32). The portion of the motion seeking the suppression of a statement defendant made at the scene, which statement was made in response to questioning initiated by a law enforcement officer, should be granted. The remainder of the motion should be denied.

Counsel are reminded they have fourteen days in which to file any objections to this Report and Recommendation. A failure to file and serve objections by this date shall bar an attack on appeal of the factual findings in this Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

*/s/ Lajuana M. Counts*
Lajuana M. Counts
United States Magistrate Judge